## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

CHRISTINE SOSEBEE,

    Plaintiff,

      v.

LIFE INSURANCE COMPANY OF
NORTH AMERICA,

    Defendant.

Civil Action No.

2:20-CV-15-RWS

## ORDER

This case comes before the Court on each party's Motion for Judgment on
the Administrative Record [Dkt. 18, Dkt. 19]. The Court has carefully reviewed the
record, and, for the reasons outlined below, judgment will be granted in favor of
Plaintiff Christine Sosebee.

## BACKGROUND

This case requires the Court to review Defendant Life Insurance Company
of North America's decision to deny disability benefits to Plaintiff Christine
Sosebee. After a series of debilitating seizure-like episodes in October 2017, Ms.
Sosebee stopped working at her job as a finance manager for a major healthcare
corporation and sought treatment for her condition. Because the symptoms were

varied, the nature of her condition was not easily identifiable. In addition to primary care and emergency doctors, she saw a rheumatologist and a neurologist, among others, and despite some improvements from various treatments, no one seemed to be able to quite pin down what ultimately caused her symptoms.

As part of her employment, she was covered by the company's disability benefits policy, which was administered by LINA. After she stopped working in October 2017, she applied for the benefits under the policy. After it reviewed her claim, LINA denied her application. A few months and doctor's notes later she appealed. LINA denied the application again. Another few months—this time with some new doctors added into the mix—and she appealed the denial again. Again, LINA denied her application.

Almost two years after she left work, she finally was diagnosed with Lyme disease, which she believed could well explain her symptoms. Even though the administrative review was over, she asked LINA to reopen her case and reconsider her application. LINA declined to do so. With her opportunities to persuade LINA exhausted, she sued the company instead.

## DISCUSSION

Ms. Sosebee's claim arises under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B). The Court begins with the standard of review.

## I.  Legal Standard

An ERISA disability case such as this one requires the Court findings based on the administrative record. The parties agree that the Court's determination is governed by the six-step approach set out by the Eleventh Circuit:

(1)  Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is wrong (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2)  If the administrator's decision in fact is *de novo* wrong, then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)  If the administrator's decision is *de novo* wrong and he was vested with discretion in reviewing claims, then determine whether reasonable grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)  If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)  If there is no conflict, then end the inquiry and affirm the decision.

(6)  If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Blankenship v. Metro. Life Ins. Co., 644 F.3d 1350, 1355 (11th Cir. 2011). The Court will apply this approach, as it must.

But in doing so, the Court notes that, in a case such as this, where it is undisputed that the administrator both was vested with discretion (Step 2) and

operated under a conflict of interest (Steps 4–6),[1] the approach can really be distilled into two questions: (1) was the employee disabled under the policy, such that the administrator's decision was wrong? And, if so, (2) taking into account the conflict of interest, was the administrator's decision arbitrary, such that it abused its discretion in managing the plan? These are addressed below.[2]

## II. Analysis

The answer to both questions is *yes*. In the sections that follow, the Court explains why for each; then the Court outlines the remedy.

### (1) Was Ms. Sosebee Disabled?

The Court must first determine whether Ms. Sosebee was in fact disabled, such that the administrator's decision was wrong.

---

[1] LINA argues that the structural features of its organization mitigate the effects of the conflict, but it does not and indeed cannot deny that such a conflict exists. In any event, as the discussion below shows, the conflict plays only a limited role in the analysis.

[2] Having reviewed the steps carefully, the Court is satisfied that this streamlined approach meets the standard. Indeed, the Court agrees with Ms. Sosebee that the steps involve, as she politely put it, a "degree of overlap." [Dkt. 19-1 at 10]. Reconsideration of this approach may be reasonable. However, given the limits on the Court's authority, this criticism does not warrant a full write up here, nor do these procedural drawbacks raise the same kind of substantive concerns that might merit a more pronounced protest. See The Honorable William M. Acker, When to Remonstrate, 49 Cumb. L. Rev. 257, 265–268 (2019) (Judge Ackerman, the district judge in Blankenship, explaining why he refused to apply the 11th Circuit ERISA standard on remand).

Under the policy, for the first two years, an employee is considered disabled if "solely because of Injury or Sickness, he or she is: 1. unable to perform the material duties of his or her Regular Occupation; and 2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation." [AR 1510]. Moreover, the plan requires that the employee be "continuously disabled" for a period of at least 180 days—referred to as the "Elimination Period"—before benefits were payable. [AR 1512, 1519]. Finally, the plan requires proof of continued disability throughout the period.[3] [AR 1510].

### A. The "Sickness"

The Court turns first to Ms. Sosebee's "Sickness"—the policy's necessary precondition to disability. Ms. Sosebee reported experiencing seizure-like "spells" or "episodes," extreme fatigue, and pain in her back and other parts of her body. The explanation for why she experienced these symptoms has been difficult to pin down. She was initially diagnosed with Lupus, but that diagnosis has since been cast into doubt. Dr. Lacey, her treating neurologist and a central figure here, initially noted that the "constellation of unusual symptoms" she experienced pointed to a "complex syndrome with evidence of several possible disorders." [AR 266–67]. He later diagnosed her with a sleep disorder (restless leg syndrome) and

---

[3] After 2 years, disability is determined by referring to Social Security standards.

concluded that the episodes were due to either extreme sleep deprivation from the disorder or to psychological issues, perhaps due to stress. Eventually, after the administrative review period ended, she was also diagnosed with Lyme disease.

Though the parties disagree about other things, the administrator does not seriously dispute that Ms. Sosebee in fact experienced these symptoms. There is no suggestion in the administrative record or the briefs here that she was malingering. Indeed, the record amply supports a finding concerning the condition from which she suffered. Instead, the administrator takes aim at Ms. Sosebee's physicians' inability to identify an obvious cure. The administrator explained its denials by focusing on the etiology of her diagnosis, instead of the symptoms. Put differently, the administrator insisted on knowing the *why*, in addition to the *what*; and when it was not satisfied by the explanation, it denied the claim.

But nothing in the policy requires that Ms. Sosebee prove what is the cause of her condition. Indeed, the policy describes "Sickness" broadly as "Any physical or mental illness." [AR 1533]; see also Lesser v. Reliance Standard Life Ins. Co., 385 F. Supp. 3d 1356, 1374 (N.D. Ga. 2019) ("[T]he Plan requires satisfactory proof of disability, not etiology. A claimant establishes eligibility under the Plan terms by proving that he cannot perform the material duties of his regular occupation, not by identifying the root cause of his illness.") Accordingly, the

Court has no trouble concluding that she in fact experienced a "Sickness" as contemplated by the policy.

### B. Inability to Perform the Material Duties

The real dispute here is whether, because of her condition, Ms. Sosebee was "unable to perform the material duties of his or her Regular Occupation." Ms. Sosebee worked as a finance manager at a major healthcare company.

She points to the debilitating nature of the episodes and extreme fatigue, contending that it would lead to frequent absences—either within a given workday or for an entire day—which would prevent her from carrying out her duties.

The administrator, on the other hand, focuses on the physical requirements of the technical classification of her job under the Dictionary of Occupational Titles: because it was a "sedentary" role, it required her to be able to exert up to 10 pounds of force and to stand occasionally. [AR 1033–34]. The administrator argues that her symptoms do not prohibit her from doing either.

The administrator takes far too narrow a view of the job. As anyone who works at a desk knows, the physical requirements of the job cover only a small fraction of what the work actually entails. A finance manager needs to be able to focus and perform complex mental tasks for extended periods of time. See Lesser, 385 F. Supp. 3d at 1370 ("The physical demands of the job are light, but the

cognitive demands are heavy."). Disruptions, fatigue, and pain all get in the way of that. In any event, no one can perform a job if they are physically absent or regularly falling asleep. See id. at 1371 ("Someone who experiences daily severe lapses in memory and concentration and is compelled to nap during the workday manifestly cannot achieve the high level of cognitive functioning that the job requires."). A frequently absent employee would soon find themselves permanently removed from the workplace.

And the administrative record amply supports a finding that Ms. Sosebee would be so limited. First, and most importantly, Dr. Lacey, her treating neurologist, explicitly stated as much in a questionnaire provided in her application. Focusing on the symptoms related to the sleep disorder, he noted that:

- Ms. Sosebee's symptoms would "Frequently" interfere with "attention, memory[,] and concentration."

- Ms. Sosebee was "Incapable of even 'low stress' jobs"

- Ms. Sosebee would need to take "unscheduled breaks."

- Ms. Sosebee would be required to "periodically rest or lie down at unpredictable intervals."

- Ms. Sosebee's probable reliability in a work setting was "Poor," the lowest possible rating.

- Ms. Sosebee's condition was "sufficiently severe and chronic" to affect her "ability to maintain a regular full-time work schedule."

- Ms. Sosebee's condition would "cause her to be absent from work" more than 4 times per month.

- Ms. Sosebee would *not* "be able to maintain and sustain gainful employment . . . in any capacity."

[AR 748–51]. And, of all the medical professionals who reviewed Dr. Lacey's records, *none* disagreed with his findings.

In addition, Ms. Sosebee took a functional capacities exam (FCE). [AR 1065–84], "which is among the most effective means of objectively measuring an individual's functional limitations." Lesser, 385 F. Supp. at 1371. During the FCE, the reviewer, who observed five of her episodes across a two-day period, concluded that she was limited from being able work. [AR 1066–67]. And though some of the findings of the FCE were challenged by the administrator's retained reviewers, no one disputes the occurrence of the episodes. Moreover, three of Ms. Sosebee's treating physicians agreed with the restrictions outlined in the FCE. [AR 108 –88].

The challenge presented by Ms. Sosebee's pertinent symptoms—her episodes and fatigue—is not unlike that of the plaintiff in Lesser. The court there described the plaintiff's symptoms and their effect on his work:

> The Plaintiff reports that he experiences bouts of daytime sleepiness and fatigue and must take one or more lengthy naps during the day. He reports that these bouts of sleepiness cause lapses in concentration and memory and that his symptoms worsen if he resists sleep . . . . The

9

> *Plaintiff's symptoms and resulting limitations would, if substantiated,*
> *clearly prevent him from performing the tasks associated with being a*
> *software engineer.*

Id. at 1370 (emphasis added). The same is true here.

Accordingly, the Court finds that, due to her "Sickness," Ms. Sosebee was "unable to perform the material duties of his or her Regular Occupation."

### C. Continuously Disabled

The final question in this part of the inquiry concerns the timing. The policy requires that she be continuously disabled throughout the elimination period to be entitled to benefits. It also requires that she demonstrate proof of continued disability throughout the period for which she is eligible.

Here, it is not terribly difficult to conclude that Ms. Sosebee was continuously disabled throughout the relevant period. The only reason there is a question in the first place is because of Dr. Lacey's written responses indicating he was only restricting her from the date he first saw her—beginning in February 2018. [AR 301]. But that evidence does not suggest that the condition was any different at that point than it was back in October 2017, when she went to the emergency room twice in three days and then stopped working; it indicates only that he could not personally attest to it before that time.

Accordingly, because she was unable to perform her regular duties due to her condition throughout the entirety of the relevant period, the Court finds that Ms. Sosebee was continuously disabled under the meaning of the policy, and that the administrator's decision to deny her benefits was wrong.

**(2) Was the Administrator's Decision Arbitrary?**

Having concluded that the administrator got it wrong, the Court must now consider whether its denial was arbitrary or capricious or instead whether it was justified by reasonable grounds in the record. In doing so, the Court is limited to reviewing the administrative record as it existed at the time of the administrator's decision-making, except that the Court must also take into account the conflict of interest inherent in the administrator's dual-role.

The administrator denied Ms. Sosebee four separate times: after her initial application, after each of her two appeals, and later, after she asked that they reopen her application after a new diagnosis. The Court's task is to assess the administrator's decision-making overall; but to do that in the most straightforward way, the Court will look at each of these decisions one-by-one.[4]

---

[4] Because the legal standard requires the Court to consider the administrator's "decision" (singular), as opposed to "decisions" (plural), it is unclear whether an arbitrary denial at an earlier review, if followed by a reasonable denial at a later point, would warrant a reversal. The Court declines to speculate on this question.

### A. The Initial Review

Given the information available at the time, the administrator's May 2018 denial of Ms. Sosebee's original application was reasonable. First, the available treatment records suggested that Ms. Sosebee was on the mend by April 2018, when the elimination period would have ended. At that point, Ms. Sosebee had been treated by Dr. Mangru, a rheumatologist, and Dr. Lacey, a neurologist. In mid-February, Dr. Mangru had diagnosed her with Lupus and prescribed appropriate medication. [AR 819–33]. By late March, after six weeks of taking the medicine, she showed "considerable improvements in her neurological symptoms." [AR 819]. By late March, Dr. Lacey had concluded that her seizure-like episodes were either "pseudoseizures" due to psychological issues, such as extreme stress, or some form of paralysis resulting from a severe lack of sleep, which might in turn be traced to restless leg syndrome. [AR 270]. He prescribed medicine to help with the restless leg syndrome, which he hoped would also reduce her anxiety. [AR 270]. Though it was early, according to Dr. Mangru, this too seemed to be helping. [AR 819].[5] The administrator could reasonably have concluded from these records that Ms. Sosebee's episodes were being effectively treated.

---

[5] In retrospect, there are two aspects of the record that cast a little doubt on Dr. Mangru's note that taking the sleep medicine prescribed by Dr. Lacey "has been helpful as well." [AR 819]. First, the note was made only one day (3/28/18) after Ms. Sosebee received the

Next, Ms. Sosebee's doctors did not appear to unambiguously restrict her from working. Dr. Mangru did not restrict her at all. Dr. Lacey did restrict her, but his restrictions appeared limited. Toward the end of the elimination period, he completed a disability request form, where he checked the box that she could not return to work. [AR 302]. But when asked to explain, the only restriction he outlined was "no driving." [AR 302]. He noted further that she "needs to improve sleep to make her able to function and drive safely." [AR 302]. Given his comments, the administrator might reasonably have concluded that Ms. Sosebee was only restricted from driving, not from working. And while the inability to drive presents a serious challenge, it is not the same as being unable to work. Many individuals can safely work without being able to drive, whether because they do not have a car or a valid license, or for some other reason.

---

prescription for her sleep medicine (3/27/18), and so the note could only have reflected one night of sleep. Moreover, on the disability request form completed a week later (4/3/18), Dr. Lacey noted that Ms. Sosebee "needs to improve sleep to make her able to function and drive safely," which seems to imply that her sleep perhaps had not improved by that point. [AR 302]. (A few weeks later (4/30/18), Dr. Lacey would confirm that the medicine "has helped somewhat" but that she continued to "have a significant amount of activity" and several more episodes. [AR 754]. But that record was not in the application at the time.) Nevertheless, these potential concerns do not mean that the administrator was required to ignore the note reflecting Dr. Mangru's apparent impression.

Finally, in reviewing these records, the doctor retained by the administrator determined that Ms. Sosebee was not disabled. [AR 314–15]. The administrator's nurse case manager came to the same conclusion. [AR 279–81]. These were reasonable conclusions to draw at the time. So, even taking into account the conflict of interest inherent in the administrator's position, the Court concludes that the administrator's decision to deny Ms. Sosebee's initial request was justified.

### B. The First Appeal

The first appeal is a different story. When reviewing the application the second time around, the administrator arbitrarily ignored the most pertinent and compelling evidence of Ms. Sosebee's disability. This was unreasonable.

The critical piece of evidence included in the application was a questionnaire supplied by Dr. Lacey, which showed that, contrary to prior impression, Ms. Sosebee had not been able to overcome the effects of her condition. Recall that Dr. Lacey is a neurologist, and his diagnosis was that the spells were likely caused by either psychological factors or a sleep disorder.

Before submitting the questionnaire, Dr. Lacey saw Ms. Sosebee twice more. After a follow up visit in late April 2018—which occurred just before the initial denial but not early enough to be included in that application—he noted that the sleep medicine had helped somewhat, but not completely. He explained that

she was still having episodes, though they were not particularly debilitating, and that she was still "precluded from driving *and working*." [AR 754 (emphasis added)]. (Apparently, despite the ambiguity in his prior note, Dr. Lacey believed that his prior restriction had applied to preclude Ms. Sosebee from working.) He then prescribed an additional medicine to try to improve her sleep. [AR 754]. Based on her follow up visit in June, this second medicine seemed to help; still, though, he prescribed a third medicine that would purportedly help with her wakefulness during the day. [AR 1016]. During this visit, there was no mention of episodes—instead the focus was on her symptoms related to the sleep disorder.

Then, at the time of the first appeal in September, Dr. Lacey confirmed his belief that Ms. Sosebee remained disabled in a questionnaire form that explicitly set out the nature of the restrictions, which the Court outlined when discussing her disability, above. And if that were not enough, for good measure, Dr. Lacey later submitted an additional form that reiterated his position that she had been "continuously disabled" since at least 2/27/18, when he first saw her. [AR 982]. In sum, Dr. Lacey's position was abundantly clear: Ms. Sosebee was unable to work.

So, with that evidence in the record, for the administrator to reasonably deny her claim, there would need to be some explanation for why it disagreed with Dr. Lacey's unmistakable conclusion. But the record reflects no such explanation.

15

The only physician retained by the administrator was the wrong kind of doctor; as a result, he explicitly deferred to Dr. Lacey for issues related to the sleep disorder and pseudoseizures. The retained doctor, a rheumatologist, concluded that "*From a rheumatological perspective* there is no evidence of functional impairment *due to her diagnosis of [Lupus]*." [AR 1029 (emphasis added)]. But of course, the new evidence did not point to her Lupus—indeed, Dr. Mangru, Ms. Sosebee's rheumatologist, had not placed any restrictions on her. The evidence pointed instead to symptoms due to sleep disorders, and with respect to that evidence, the doctor said "I will defer the issues of pseudoseizures and sleep disorders . . . to the appropriate specialist." [AR 1029]. He also noted that "From a neurological perspective *the issues that preclude her from work* are related to sleep primarily." [AR 1029 (emphasis added)]. So, he did not dispute that the issues upon which he expressed no opinion may in fact preclude her from working.

Given the limited scope of the rheumatologist's review, Dr. Lacey's evidence related to her disability was essentially undisputed by any medical professional. Rather than consult a neurologist, the administrator simply ignored Dr. Lacey's evidence and denied the appeal based almost entirely on the retained rheumatologist's report. Indeed, the explanation section entitled "How was the Appeal Decision Reached" includes three paragraphs, all of which refer to her

diagnosis of Lupus and the rheumatological review. There is no mention whatsoever of her sleep disorder or issues related to sleep.

Clearly, even before considering the administrator's conflict of interest, to ignore undisputed evidence of disability—indeed, to categorically omit a diagnosis which underlay her claimed disability—was arbitrary and unreasonable. See Lesser, 385 F. Supp. 3d at 1377 ("[A]rbitrarily ignoring substantial evidence of disability is wrong and unreasonable.") In its briefs, LINA endeavors to frame this dispute as concerning the relative weight to be accorded to each sides' physicians, akin to a battle of the experts. But that is not what happened. There was no disagreement, no battle. Whether inadvertently or intentionally, Dr. Lacey's opinion, instead of being refuted, was simply cast aside.  This the administrator could not do; its denial of her first appeal was unreasonable.

Still, that conclusion does not end the Court's inquiry,[6] and so the Court continues to the administrator's denial of the second appeal.

### C. The Second Appeal

Despite involving many more records and reviewing professionals, the denial of the second appeal was also unreasonable, and for a similar reason: the reviewers and administrator failed to address Dr. Lacey's questionnaire. This time,

---

[6] See n.4, above.

the administrator brought in the right kind of physicians, including a neurologist and a psychologist, to review the application. But, inexplicably, none of their reports indicate that they reviewed the questionnaire.

The psychologist included a list of "Documents Reviewed" in his report; among them are Dr. Lacey's reports and forms that were submitted in the initial application, but conspicuously absent are the critical pieces of evidence discussed above: Dr. Lacey's reports from April and June and the questionnaire where he explicitly outlined Ms. Sosebee's restrictions. [AR 1182]. The omission is strange, but not totally problematic; after all, the psychologist focused his review on the new records from Ms. Sosebee's own psychologist. And that meant a more limited scope. As with the rheumatologist in the first appeal, he explicitly deferred "to her specialist to determine restrictions for her suspected diagnosis of . . . non-epileptic seizures." [AR 1184]. The only difference here is that, without the additional records, he did not appear to know that, in so deferring, he might be implicitly endorsing the restrictions outlined by Dr. Lacey.

The absence of the records from the neurologist's review is much more troubling: first, because he was of the same specialty and purported to review Dr. Lacey's reports, and second, because Dr. Lacey's treatment records from after the questionnaire were included. In the neurologist's list are Dr. Lacey's notes from

February and March, as well as later reports from office visits in October, when

Dr. Lacey notes that Ms. Sosebee was improving. [AR 1194–95, 1197–99]. But as

for the April and June reports and the all-important questionnaire (and follow

up)—they are nowhere mentioned. [Id.].

Clearly, the neurologist was reviewing an incomplete set of records. Indeed,

without those additional records, it is perhaps no surprise that when summarizing

the "Restrictions and Limitations per attending physician(s)," he lists only Dr.

Lacey's driving restriction. [AR 1195]. It is equally unsurprising that, when asked

whether Ms. Sosebee was functionally limited, he said no. But his conclusion

highlighted its own limitations: "*according to the records provided to me*," he

wrote, "it is medically reasonable to say that from a neurological standpoint, the

claimant is not functionally limited." [AR 1197 (emphasis added)]. He also stated

that he had "No disagreement" with Dr. Lacey's finding, which could only be true

if he did not review the full set of records. [AR 1196]. It follows that, without

doing so, his conclusion abou Ms. Sosebee's condition was necessarily flawed.

A third retained doctor, specializing in occupational medicine, also appears

not to have reviewed Dr. Lacey's questionnaire. She did review his June note, but

it is unclear if she reviewed the April note (which states the problems more

explicitly than the June one), because she mentions reviewing office notes from

"02/18–10/18" but does not separately list the June one as she did for the others. [AR 1132, 1134]. Critically, though, the questionnaire is nowhere mentioned. And, in any event, based on her review of these notes (without the questionnaire), she actually concluded that "Evidence supports hyposomnia related restrictions and limitations," but limited those restrictions to hazard activities. It begs the question: would her restrictions have been so limited if she had reviewed the entirety of Dr. Lacey's recommendations?

The absence of the most pertinent evidence from the review not only undermines the reliability of the retained physicians' recommendations, it casts a pall over the administrator's approach to this appeal. And it is precisely here where the presence of a conflict of interest allows for the Court to consider the possibility that the administrator was acting in its own best interest instead of Ms. Sosebee's. Indeed, it already seemed implausible that the administrator overlooked the records in the first appeal. But now, the second time around, to have them selectively omitted from the physicians' reports is even more so.

As with the prior appeal, without any evidence directly refuting it, Dr. Lacey's questionnaire was enough to establish Ms. Sosebee's disability, and its omission from the administrator's decision-making process renders the denial of

her claim arbitrary and unreasonable.[7] Accordingly, Ms. Sosebee is entitled to a reversal of the administrator's decision.

### D. The Post-Appeal Response

The Court concluded above that the administrator acted arbitrarily in its reviews. But the Court notes further that its post-review decision would nevertheless warrant a remand on its own.

After her second appeal was denied, Ms. Sosebee was eventually diagnosed with Lyme disease instead of Lupus. She contends that, even if she were not entitled to a full reversal, she would be entitled to a remand for the administrator to reconsider her appeal. The Court agrees. Of course, it is important to preserve finality, and not to multiply efforts unnecessarily. But this is exactly the sort of case where, if not for a judgment, a remand would be warranted, so that the

---

[7] As such, the Court need not consider the additional evidence that Ms. Sosebee presented to the administrator. But that is not to suggest that other evidence was lacking. As explained in the prior section, she presented a functional capacities exam (FCE). [AR 1065–84], which is "which is among the most effective means of objectively measuring an individual's functional limitations." <u>Lesser</u>, 385 F. Supp. 3d at 1371. Ms. Sosebee also provided statements from three of her treating physicians agreeing with the restrictions outlined in the FCE. [AR 1085 – 88]. To be sure, the administrator's retained physicians disagreed with some of those findings. But the Court need not determine whether those disagreements were reasonable. It suffices to note that there was enough evidence that Dr. Lacey's determination about Ms. Sosebee's restrictions was not an outlier.

administrator could consider the additional diagnosis along with the other records that appear to have been ignored or otherwise discounted.

From the outset, this was a difficult disability to pin down—a "complex syndrome with evidence of several possible disorders," according to Ms. Sosebee's doctor. [AR 267]. Yet the administrator explained its denials—incorrectly, as explained above—by focusing on the etiology of her diagnosis, instead of the symptoms. But doing so, and then later preventing Ms. Sosebee from preventing evidence once the real diagnosis became known meant that Ms. Sosebee never had a meaningful opportunity to convince the administrator of the validity of her claim.

## III.   Remedy

The Court finds that the current record supports an award of the benefits payments for the 2-year long term disability period. The record does not reflect, however, whether Ms. Sosebee remained disabled after the period ended. Moreover, the definition of a disability changes after that point. Therefore, after this judgment becomes final, the case will be remanded to the administrator to consider Ms. Sosebee's claim for ongoing benefits.

The Court will not enter final judgment at this time, however, because Ms. Sosebee has requested attorney's fees and prejudgment interest in this case. The Court may award either or both forms of relief at its discretion. See Lesser, 385 F.

Supp. 3d at 1379 (citing <u>Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Alabama</u>, 41 F.3d 1476, 1484 (11th Cir. 1995) ("The award of an amount of prejudgment interest in an ERISA case is a matter 'committed to the sound discretion of the trial court.'")). The Court will permit the Plaintiff to submit a separate motion for prejudgment interest and attorney's fees. The motion should be accompanied by a proposed final judgment order detailing, in specific dollar amounts, the award that Ms. Sosebee is claiming under the policy.

## CONCLUSION

For the foregoing reasons, Defendant LINA's Motion for Judgment [Dkt. 14] is **DENIED**, and Plaintiff Christine Sosebee's Motion for Judgment [Dkt. 15] is **GRANTED**.  Ms. Sosebee is **DIRECTED** to **FILE** a motion for final judgment **WITHIN 30 DAYS**. In keeping with the usual briefing schedule, LINA will then have **14 DAYS** from the date of the motion's filing to respond; Ms. Sosebee will have **7 DAYS** thereafter to reply.

**SO ORDERED** this 2nd day of April, 2021.

_____
**RICHARD W. STORY**
United States District Judge